4200, 4201.  SHAW *v.* CITY OF ATLANTA (two cases).

1. Section 1537 of the Code of Atlanta, which prohibits the keeping for unlawful sale of intoxicating liquors in any of the places described in the section, is not invalid, as being an attempt to regulate or interfere with interstate commerce. The section has no application to the keeping of intoxicating liquors by a carrier while engaged in interstate commerce.

2. A citizen of Atlanta who has ordered intoxicating liquor to be shipped to that city in interstate commerce can not be convicted of a violation of § 1537 of the Code of Atlanta, until after the contract of carriage is completed by delivery to the person for whom the liquor was intended, or some agent authorized by him to receive it.

3. Where intoxicating liquors are brought to Atlanta in interstate commerce, for delivery to a resident of that city, who pays the 'freight and surrenders the bills of lading and receives from the carrier an order directed to its agent for the delivery of the liquors, the contract of carriage is ended, and the carrier thereafter holds the goods as the agent of the person entitled to receive them, and if such person intends to use the liquors for the purpose of unlawful sale, he can be convicted of a violation of § 1537 of the Code of Atlanta, even though he has not taken the liquors from the custody of the carrier.

4. As a general rule, where an owner of goods delivers them to a common carrier in one State, consigned to his own order in another State, with direction to the carrier to notify a third person in the latter State, delivery to the carrier is delivery to the consignee. In such a case the title remains in the shipper, and the goods are subject to his direction and control until delivery is consummated in the State of destination.

5. Where a bill of lading issued by a common carrier calls for the delivery of a certain package said to contain whisky, and a package is

found in the possession of the carrier, corresponding in number and weight to the description in the bill of lading, and having thereon marks indicating that it contains intoxicating liquor, a prima facie case is made out that the package in fact contains such liquor.

DECIDED JULY 10, 1912.

Certiorari; from Fulton superior court—Judge Bell.    March 21, 1912.

The plaintiff in error was convicted in two cases of violating the provisions of an ordinance of the City of Atlanta, a copy of which is as follows: "Any person, firm, or corporation who shall keep for unlawful sale in any store, house, room, office, cellar, stand, booth, stall, or other place, or shall have contained for unlawful sale in any barrel, keg, can, demijohn, or other package, any spirituous, fermented, or malt liquors for such sale, shall on conviction be punished by fine not exceeding five hundred dollars, or imprisonment not exceeding thirty days, or labor on the public works for not exceeding thirty days, or, in the discretion of said recorder, such offender may be punished by a fine not exceeding five hundred dollars and imprisonment not. exceeding thirty days, or by fine not exceeding five hundred dollars and labor on the public works for not exceeding thirty days." Intoxicating liquors were shipped by freight from Chattanooga, Tennessee, from R. M. Rose, consigned to his order, with a direction in the bill of lading to notify a named person. In some way, not disclosed by the record, Shaw came into possession of the bills of lading. On the back of each bill was an order, signed by the consignor, to deliver the goods to —————————————————, the name of the person entitled to receive them not being filled in by the consignor. In case No. 4201 it appears that Shaw was in possession of a large number of these bills of lading, which described the goods shipped as whisky, consigned to R. M. Rose, the shipper, "order notify Fred Walker." It does not appear whether Walker was a real or a fictitious person, nor does it appear how Shaw came into possession of the bills of lading. He employed one Coggins to receive the goods for him. Coggins signed his own name in the blank indorsement, on the reverse side of each bill of lading, and presented them to the agent of the carrier and demanded the goods. This agent accepted the bills of lading and delivered to Coggins orders upon another agent of the carrier for the goods, these orders being referred to in the record as "expense bills." Coggins delivered the expense bills to Shaw. It appears that in the carrier's warehouse

and in a place called the "whisky pen" there were boxes and packages corresponding to those described in the bills of lading and expense bills, each of the packages having marks on the outside indicating that it contained intoxicating liquor. None of the packages ever came into the actual manual possession of either Shaw or Coggins, and none of them were ever broken to ascertain if they in fact contained intoxicating liquor.

In case No. 4200 Shaw was arrested while he had upon his person 17 bills of lading such as are described above, except that the order was to "notify Salesman's Club." The testimony of the police officer indicates that there is probably no such organization in Atlanta as the "Salesman's Club." If there is, Shaw was not shown to have any connection with it. While on the way to the police station in a buggy, Shaw surreptitiously dropped the bills of lading to the ground. The police officer recovered them, signed his own name in the blank indorsement on the back, delivered them to the carrier, and received in their stead "expense bills," upon the surrender of which the packages were delivered to him. When broken open they were found to contain intoxicating liquor. When found by the officer the goods had but shortly arrived from Chattanooga, and no effort had been made to effectuate delivery to Shaw or to any one for him. The delivery of the packages to the officer in the manner above pointed out was made without the knowledge or consent of Shaw.

The questions presented by the record in each of the two cases are: (1) Is the ordinance void, as being an unlawful attempt to interfere with interstate commerce? (2) Can the plaintiff in error, on the facts proved, be convicted of keeping intoxicating liquors for the purpose of unlawful sale, before obtaining the actual custody of the liquors? (3) If he can, is the evidence otherwise sufficient to sustain the conviction?

*John A. Boykin,* for plaintiff in error.
*James L. Mayson, W. D. Ellis,* contra.

POTTLE, J. Prior to the passage of the act of Congress known as the "Wilson act" the right of a citizen of one State to import intoxicating liquor from another State and sell it in the original package could not be taken away by the State. Intoxicating liquor being a legitimate subject of commerce, the police power of the State did not become operative until after the original package was

broken and the contents had become intermingled with the general mass of property in the State. The right to sell "was an inseparable incident to the right to import." Bowman *v.* Chicago Ry. Co., 125 U. S. 466 (8 Sup. Ct. 689, 31 L. ed. 700) ; Leisy *v.* Hardin, 135 U. S. 100 (10 Sup. Ct. 681, 34 L. ed. 128). The Wilson act provided that intoxicating liquors shipped in interstate commerce from one State to another "should, upon arrival in a State or territory, be subject to the operation and effect of the laws of such State or territory." It was at first thought, and was held by several of the State courts, that this language of the act gave the States the right to legislate the moment the shipment arrived at the State line, but the Supreme Court of the United States in several cases distinctly held that a shipment of intoxicating liquors moving in interstate commerce was protected from adverse legislation by the State, under its police power, until delivery to the person entitled to receive it. Vance *v.* Vandercock Co., 170 U. S. 438 (18 Sup. Ct. 645, 42 L. ed. 1100) ; Rhodes *v.* Iowa, 170 U. S. 412 (18 Sup. Ct. 664, 42 L. ed. 1088) ; American Express Co. *v.* Iowa, 196 U. S. 131 (25 Sup. Ct. 182, 49 L. ed. 417).

In Heyman *v.* Southern Ry. Co., 203 U. S. 270 (27 Sup. Ct. 104, 51 L. ed. 178), the writ of error was sued out to test the correctness of a decision of the Supreme Court of Georgia, reported in 118 *Ga.* 616 (45 S. E. 491). The Supreme Court of Georgia held that although the goods had not been delivered to the consignees, and although there was no showing of notice to them from the carrier of the lapse of a reasonable time for the consignees to call for and accept delivery, or even if by the local law such notice was unnecessary, the interstate transportation ended when the goods were placed in the carrier's warehouse, and the carrier was thenceforward liable only as a warehouseman, and the goods ceased to be under the shelter of the interstate-commerce clause of the constitution. This conclusion was based upon the theory that the goods must be considered as having arrived, within the meaning of the Wilson act, when they were warehoused by the carrier. The Supreme Court of the United States reversed the judgment of the Supreme Court of Georgia, and announced its ruling as follows: "As the general principle is that goods moving in interstate commerce cease to be such commerce only after delivery and sale in the original package, and as the settled rule is that the Wilson law

was not an abdication of the power of Congress to regulate inter-
state commerce, since that law simply affects an incident of such
commerce by allowing the State power to attach after delivery and
before sale, we are not concerned with whether, under the law of
any particular State, the liability of a railroad company as carrier
ceases and becomes that of a warehouseman on the goods reaching
their ultimate destination, before notice and before the expiration
of a reasonable time for the consignee to receive the goods from the
carrier.   For, whatever may be the divergent legal rules in the
several States concerning the precise time when the liability of a
carrier, as such, in respect to the carriage of goods, ends, they can
not affect the general principle as to when an interstate shipment
ceases to be under the protection of the commerce clause of the
constitution, and thereby comes under the control of the State au-
thority." In the course of the opinion the court took occasion to
say that it did not hold, and that the court was not called upon
to decide, if the goods, after arrival at the point of destination and
after notice and full opportunity to receive them, are "designedly
left in the hands of the carrier for an unreasonable time, that
such conduct on the part of the consignee might not justify, if
affirmatively alleged and proven, the holding that goods so dealt
with have come under the operation of the Wilson act, because
constructively delivered."

A careful examination of the various decisions of the Supreme
Court of the United States upon the subject will conclusively show
that the Wilson act did not affect the right of an importer to ship
intoxicating liquors in interstate commerce, nor the right of the
purchaser to receive them, and that the only effect of the Wilson
act was to permit the State to which the goods were consigned to
legislate under its police power upon the subject after the contract
of carriage had ceased and the goods had been delivered to the
person entitled to receive them.  Some of the State courts have
held that interstate commerce does not cease and transportation is
not ended until the goods are actually delivered at the home of the
person entitled to receive them in the State to which they are
shipped.  The Supreme Court of Maine announced this rule as
being applicable in a case where a c. o. d. shipment was made by
express, directed to the consignee, at his residence.  In Oklahoma,
however, the same rule was announced in the case of a shipment by

freight without any direction to deliver at a particular address. High *v*. State, 2 Okl. Cr. 161 (101 Pac. 115, 28 L. R. A., N. S. 162) ; Moreland *v*. State, 2 Okl. Cr. 237 (101 Pac. 138) ; Hudson *v*. State, 2 Okl. Cr. 176 (101 Pac. 275). In State *v*. Eighteen Casks of Beer, 24 Okl. 786 (104 Pac. 1093), the Supreme Court of Oklahoma held that where a bill of lading had been surrendered by the consignee and the freight paid, intoxicating liquors were subject to the State law, notwithstanding the liquors were left on the premises of the carrier. It was accordingly ruled that where it appeared that the consignee intended to sell such liquors contrary to the laws of the State, they were subject to seizure and confiscation under the State law, notwithstanding they had not been taken from the carrier's premises. In State *v*. Intoxicating Liquors, 102 Me. 206 (66 Atl. 393, 11 L. R. A., N. S. 550), it was held that the interstate-commerce transportation was not ended, in the absence of a special contract to the contrary, until the freight was transported to the carrier's warehouse and there removed from the car. In McCord *v*. State, 2 Okl. Cr. 214 (101 Pac. 280), the accused was convicted of unlawfully having in his possession certain intoxicating liquors with the intention of selling the same in violation of the State prohibition law. It appeared that five barrels of beer were shipped in interstate commerce, consigned to the defendant, who sent a dray to the carrier's depot and had the beer unloaded from the car onto the dray. While on the dray they were seized by the sheriff, and the arrest of the defendant followed. The judgment of conviction was reversed, and it was held that the section of the statute which prohibited the having in possession of intoxicating liquors with the intention of violating any of the provisions of the section had no application to an interstate shipment, until there had been a delivery of the liquors at their destination.

We are not prepared to go to the extent to which the Oklahoma court has gone, that an interstate shipment of intoxicating liquor will be protected against adverse State legislation until actual delivery at the home or place of business of the person entitled to receive it. It is protected until delivery to such person, but delivery may be consummated as well at the warehouse of the carrier as elsewhere. Certainly in a case where the bill of lading is surrendered and the freight paid and an order issued for the delivery of the goods, and the liquors are thereafter held for the holder of the

order, this would in law amount to delivery, and the interstate transportation would be ended, even though the goods be left in the actual custody of the carrier. In such a case the carrier would simply be the agent of the person entitled to receive the goods, holding them subject to his order. The general rule is that if goods be left in the hands of the carrier at the place of destination, after notice to the consignee of their arrival, and a sufficient length of time has elapsed after receipt of notice to enable him to take them from its possession, the relation of the carrier to the goods is that of warehouseman, and not that of carrier. 1 Woollen & Thornton, Law of Intoxicating Liquors, § 204; Hutchinson, Carriers (3d ed.), § 769.

There can be no doubt that if the person to whom intoxicating liquors are shipped in this State in interstate commerce, by agreement with the carrier, stores them in the carrier's warehouse and keeps them there for the purpose of unlawful sale, he would be subject to conviction under an ordinance such as that involved in this case. *Stradley* v. *Atlanta*, 7 *Ga. App.* 441 (67 S. E. 107). Such is the distinct intimation of the Supreme Court of the United States in one of the cases above referred to. In such a case it is also clear that the agent of the carrier and every other person who colludes with the owner to violate the law would be equally guilty. In this connection the remarks of the Supreme Court of the United States in reference to the conduct of the carrier handling interstate-commerce shipments of intoxicating liquors, in the case of Adams Express Co. *v.* Kentucky, 206 U. S. 129 (27 Sup. Ct. 606, 51 L. ed. 987), are pertinent. We therefore conclude that the evidence in case No. 4201 was sufficient to show that delivery was consummated; that the contract of carriage was ended, and that the agent of the carrier held the goods as agent for the true owner. The evidence was sufficient to authorize a finding that the plaintiff in error was the owner of the goods, and that Coggins had receipted for them as his agent, and the circumstances were sufficient to authorize the finding that the goods were being held for the purpose of unlawful sale.

It is contended that inasmuch as there was no proof as to the actual contents of the packages, the recorder was not authorized to find that they contained intoxicants. The bills of lading called for whisky, and packages corresponding to the description in the

bills of lading were found in the carrier's warehouse, in a portion thereof called the "whisky pen," and set apart and used for the storage of intoxicating liquors. The packages all had marks on them indicating that the contents were intoxicating liquors. This was sufficient to authorize a finding that the packages did in fact contain intoxicating liquors, and to cast the burden on the accused to show that they did not. . See *Tompkins* v. *State,* 2 *Ga. App.* 639 (58 S. E. 1111).

The point that the ordinance is unconstitutional is entirely without merit. The courts are inclined to so construe a law as to uphold its constitutionality. There is nothing in the ordinance which on its face appears to interfere in any way with interstate commerce; and therefore it can not be held to be void on its face. The presumption is that the city authorities did not intend the ordinance to apply to interstate shipments until after the contract of carriage had ended. Where it appears that the goods are still under the shelter of the interstate-commerce clause of the constitution of the United States, it will be held that the city ordinance of Atlanta has no application. We, therefore, think that the conviction of the plaintiff in error in case No. 4201 was authorized, and that the judge of the superior court did not abuse his discretion in overruling the certiorari.

In case No. 4200 a different conclusion must be reached. The liquors had never been actually or constructively delivered to the plaintiff in error. The general rule that delivery to the carrier is delivery to the person for whom they were intended has no application to this case. The goods were consigned to R. M. Rose, the shipper. Presumptively, therefore, delivery to the carrier was delivery to Rose. The title remained in Rose until an actual sale, consummated by delivery at destination. The order on the bill of lading to notify a named person does not change this presumption. The effect of this order was simply to ship goods to Atlanta for Rose, the consignor, and in care of the person to be notified. This person was the agent of Rose. See, in this connection, *Raleigh Ry. Co.* v. *Lowe,* 101 *Ga.* 320, 331 (28 S. E. 867) ; *American Natl. Bank* v. *Lee,* 124 *Ga.* 863 (53 S. E. 268) ; *Fla. Central & P. R. Co.* v. *Berry,* 116 *Ga.* 19 (42 S. E. 371) ; Hutchinson, Carriers (3d ed.), § 187. If direction had been given to the carrier by Rose upon the back of the bill of lading to deliver the goods to a

named person, the rule might be different, for such an indorsement would be valid and a sufficient assignment of the bill of lading to the person named. *Allen* v. *Farmers Natl. Bank*, 129 *Ga.* 748 (59 S. E. 813). Of course, there might be an actual agreement between the shipper and the carrier to deliver the goods to a named person, or there might be an understanding or arrangement under which delivery to the carrier would be held to be delivery to the person at destination, notwithstanding a form of bill of lading or receipt might be used such as was employed in the present case, but here there is no evidence of any agreement or arrangement different from that appearing from the bill of lading. The case, so far as it appears from the evidence, is simply one where Rose shipped intoxicating liquors from Chattanooga to himself in Atlanta, in care of a person whose name appeared in the bill of lading, with direction to deliver the shipment to some person not named. This direction was not valid and ought to have been ignored by the carrier. As between Rose and the carrier, delivery would be made at the peril of the carrier, and if the agent of the carrier did make such delivery knowing that the goods were to be used for an unlawful purpose, or had reasonable grounds to suspect it, it is not at all certain that the agent would not be equally guilty with the person who received them and the person who ultimately intended to sell them.

Under the facts as disclosed by this record, the goods were still in the hands of the carrier, in interstate commerce, when delivered to the police officer. The contract of carriage had not been completed, and delivery was made to the officer without authority of law and without the knowledge or consent of the consignor, Rose, or of any person to whom delivery was intended. Even if possession of the bills of lading by Shaw was sufficient to authorize a finding that the liquors were intended for him, he did not consent for delivery to be made to the police officer, nor could he be said to have had the liquors in his possession at all, for any purpose. The carrier was not his agent, and until the contract of carriage had ended and as long as the goods were in interstate commerce, the plaintiff in error could not be said to have had such dominion or control over them, either by himself or by his agent, as would authorize his conviction for keeping them on hand for unlawful sale. It may be that he intended to get possession of them for

the purpose of selling them illegally, but mere preparation to commit a crime is no offense. He could no more be convicted than could one be said to be guilty of murder because he had a loaded gun and had indicated his intention to take human life.

It has been suggested that while the interstate-commerce clause of the Federal constitution will protect an interstate shipment of intoxicating liquors and forbid the State's seizing them or doing any other act which would prevent or unduly hamper the interstate transportation of the goods, yet at the same time the State may penalize any person who orders such goods to use them for an unlawful purpose. In our opinion this is entirely too narrow a view of the interstate-commerce clause of the Federal constitution, as construed and applied by the Supreme Court of the United States. If the State could say to one of its citizens, "You may order liquors to be shipped to you in interstate commerce as often and as freely as you please, because you are protected by the Federal constitution, but at the same time we will seize your person and thus prevent you from receiving the shipment," it is clear that interstate commerce in intoxicating liquors could be totally destroyed. The interstate-commerce clause of the Federal constitution not only protects interstate shipments, but it protects the person to whom the goods are shipped, and it protects the carrier until the contract of carriage is ended and the person for whom they are intended gets possession of the goods, either himself or through an agent. The Supreme Court of the United States has repeatedly expressed sympathy with the efforts of the States to prevent traffic in intoxicating liquors, but at the same time it has uniformly held that, being a subject of interstate commerce, they are beyond the power of the State, except in so far as the right to legislate has been granted by Congress, under and in pursuance of the constitution of the United States.

The records before us disclose a practice participated in by the carriers which is to be condemned, and which we may say, in passing, is a very dangerous one for the agents of the carriers who participate in it. It seems that it has been the practice among some of the carriers to effect a constructive delivery of intoxicating liquors to citizens of Atlanta who have ordered them, and to retain actual possession of the liquors for the benefit of such persons, permitting them to take possession of the liquors as they needed them

from time to time. When a carrier ceases the legitimate business of transportation of intoxicating liquors and goes into the business of a warehouseman in reference to the liquors, holding them for a long time for the benefit of persons who have not ordered them for a legitimate purpose, a grave suspicion arises that the agents of the carrier, if not in actual collusion with the persons to whom the liquors are shipped, are at least complacently acquiescent in the violation of the law. As said by the Supreme Court of the United States in one of the cases cited above, a carrier, though engaged in interstate commerce, may violate the law in reference to the sale and disposition of intoxicating liquors as well as any other person. In misdemeanors all are principals.

In case No. 4201 a judgment of affirmance will be entered, and in case No. 4200 the judgment overruling the certiorari will be reversed, on the ground that the conviction was without evidence to sustain it. *Judgment affirmed in No. 4201; reversed in No. 4200.*